UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
CARL WATKINS,

|  |  |  |
|---|---|---|
| | Petitioner, | **REPORT & RECOMMENDATION** |
| | -against- | 08 Civ. 5891 (RJH)(MHD) |
| DALE ARTUS, | | |
| | Respondent. | |

TO THE HONORABLE RICHARD J. HOLWELL, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/22/10

Pro se petitioner Carl Watkins seeks a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction in the New York State Supreme Court, New York County, on two counts of Burglary in the Second Degree (N.Y. Penal Law § 140.25(2)) and two counts of Attempted Burglary in the Second Degree (N.Y. Penal Law §§ 110, 140.25(2)). On March 30, 2004, after a jury trial, the court sentenced petitioner, as a persistent violent felony offender under New York Penal Law section 70.08, to four concurrent indeterminate prison terms of twenty years to life. The Appellate Division, First Department, affirmed the judgment on May 8, 2007, and then on July 6, 2007, the New York Court of Appeals denied Watkins leave to appeal to that court. Petitioner is currently held at Clinton Correctional Facility.

In substance, petitioner asserts four claims in his habeas petition. First, he argues that he was denied his right to testify

before the grand jury after he had provided notice of his intent to do so. (Pet. 6). Second, he claims that his Fourth-Amendment rights were violated when police officers stopped him on the street and subjected him to a show-up without reasonable suspicion (pet. 13), and when the trial court ordered him to submit a DNA sample for analysis without probable cause. (Pet. 23). Third, he asserts that he was deprived of his right to confrontation by the admission of testimony from an expert witness who had not conducted the DNA tests about which she testified. (Pet. 17). Fourth, petitioner argues that the trial court violated the principles of Apprendi v. New Jersey, 530 U.S. 466 (2000), by not submitting the question of his status as a persistent violent felon to a jury. (Pet. 21).

The State opposes the petition. First, respondent argues that because there is no federal right to appear before a grand jury, any defects in grand-jury proceedings are a matter of state law and are not cognizable for habeas review. (Resp't's Mem. in Opp'n to Habeas Pet. ("Resp.") 22). Second, respondent asserts that petitioner had an opportunity to litigate his Fourth-Amendment claims in state court and that federal habeas review is therefore not available under Stone v. Powell, 428 U.S. 465 (1976). (Resp. 25). Third, respondent argues that petitioner's Confrontation-Clause claim is procedurally barred and meritless. (Resp. 35-36). Finally, respondent asserts that petitioner's challenge to his

2

designation as a persistent violent offender is also procedurally barred and, in any event, groundless. (Resp. 35-36).

For the reasons set forth below, we recommend that the writ be denied and the petition dismissed.

## BACKGROUND

I. The Facts

Petitioner's arrest and conviction stem from a series burglaries that took place on the Upper West Side of Manhattan on May 19 and June 18, 2003. We briefly summarize the facts that the jury was free to find in support of the verdict.

On June 18, 2003, at about 12:30 p.m., Iona Lutey heard a noise in her bedroom on the fifth floor of 33 West 84th Street. (Transcript of Trial beginning March 1, 2004 before the Honorable Edward McLaughlin ("Tr.") 272, 275-76). She noticed that one of her windows, which was originally closed, had been opened and that the fence on her terrace had been pushed open. (Tr. 276-77). Through the open fence, she saw a man, whom she later identified in a line-up as petitioner, about 20 feet away and climbing up a board that led to the rooftop of an adjacent building, 29 West 84th Street. (Tr. 277-79, 577). The man, a black man wearing a blue skull cap,

3

told Ms. Lutey that he was working for the residents of the penthouse apartment at 29 West 84th Street, and then proceeded onto the rooftop of that building and out of her sight. (Tr. 279-80). Ms. Lutey called the police and later discovered that two gardening gloves from her terrace were missing. (Tr. 280-84).

On the same day, at around 1:30 p.m., Police Officer Robert Lynch and Detective Israel Dros responded to a report of an attempted burglary at 370 Columbus Avenue. (Tr. 452-53). A resident at that address, Gretchen Schumacher, informed the two officers that a black man wearing a red jacket and a white baseball cap had tried to enter her apartment through a window. (Tr. 310-12). She had yelled at the man, and although she could not see him clearly, she did catch sight of him going downstairs into the courtyard. (Tr. 313, 316-17). The officers searched the courtyard behind the building, the first floor, and the rooftop without success. (Tr. 458-59). Officer Lynch then went down to look for potential witnesses on 77th Street and noticed petitioner on Columbus Avenue, illegally riding a bicycle on the sidewalk. (Tr. 459-62). Petitioner was wearing a brown woman's hat, a long black raincoat, and a red garment under his coat -- an apron -- which caught Officer Lynch's attention. (Tr. 461-62).

4

Officer Lynch identified himself to the petitioner and obtained identification from him. (Tr. 462-63). The officer led petitioner to the front of 370 Columbus Avenue for a "show-up", but Ms. Schumacher responded that petitioner was not the person she had seen. (Tr. 462-63, 477-80). Petitioner then left. (Tr. 463-64).

Officer Lynch and Detective Dros then received a radio call about still another burglary, this one nearby at 114 West 78th Street. (Tr. 464-65). They arrived on the scene at around 3:00 p.m. and spoke with Ms. Mary Rose. (Tr. 465, 473). According to Ms. Rose, when she returned home at 2:30 that afternoon, she observed that the front door of her apartment was open, that her rear door had been smashed, and that a fireplace grating belonging in the garden was on her bedroom floor. (Tr. 492, 494-95). In addition, she noticed drops of blood on the floor around her apartment. (Tr. 496-97).

At the scene, the officers also spoke with Kirk McDonald, a fellow resident and the owner of the building, who stated that he had gone to Ms. Rose's apartment after hearing her scream. (Tr. 465, 506). Mr. McDonald had noticed blood in the building. (Tr. 507). He also noted that his bicycle, his wife's English rain hat, and a red apron were missing from the entryway of the building and that a red jacket and a white cap belonging neither to him nor to

5

Ms. Rose had been left in the entryway. (Tr. 508-10). Officer Lynch
told Detective Dros that the person whom he had stopped earlier --
that is, petitioner -- had been wearing the stolen articles of
clothing. (Tr. 580-82, 584).

Later that day -- between 7:00 p.m. and 8:00 p.m. -- Elizabeth
Sweeney arrived at her apartment at 29 West 84th Street. (Tr. 423-
25). She found her front door unlocked, her walkman on the kitchen
floor, and a chair knocked over. (Tr. 425-26). After discovering a
blue skull cap that did not belong to her in her bedroom, she
immediately called the police. (Tr. 426). While waiting for the
police, Ms. Sweeney contacted her roommate Jennifer Frey, who
returned home shortly thereafter. (Tr. 427). Ms. Frey found her
bedroom disordered and discovered a gold Nokia cell phone and a
pack of gum that did not belong to her next to her nightstand. (Tr.
437-38). Ms. Frey then entered the bedroom of the third roommate,
Beth Holman, and found on the floor two gardening gloves that she
had never seen before. (Tr. 438-39). While looking through the
apartment, Ms. Sweeney further realized that her bicycle, her white
Nike running hat, and a red ski jacket were missing. (Tr. 428-29).

Detective James Murphy, who was investigating the burglary at
29 West 84th Street, examined the gold cell phone left at that
scene and informed Detective Dros of the phone numbers stored

6

inside the phone, suspecting that they may be related to another, earlier burglary. (Tr. 327). Detective John Heintz inspected the cell phone and learned that the cell phone account was from the T-Mobile phone company. (Tr. 332-53). He contacted T-Mobile and learned that the phone belonged to petitioner. (Id.).

The next day, following conversations with Officer Lynch and Detective Murphy, Detective Dros placed petitioner under arrest at 314 West 40th Street. (Tr. 562). In the course of effecting the arrest, Detective Dros searched petitioner's person and uncovered a pawnshop ticket and identification belonging to a Thomas Geest.[1] (Tr. of Pretrial Hr'g held before the Honorable Jeffrey Atlas on Jan. 8, 2004 ("Hr'g Tr.) 77-78, 113, 125). The day following Watkins' arrest, he was placed in a line-up with his attorney present. (Tr. 566-71). Ms. Lutey identified petitioner as the person whom she had seen on the rooftop of 29 West 84th Street on June 18, 2003. (Tr. 287-88, 301, 577). Ms. Schumacher, from 370 Columbus Avenue, was unable to identify petitioner. (Tr. 318-31, 323, 585).

---

[1] Neither Detective Dros' search nor the items recovered from petitioner's person were mentioned at trial, as petitioner pleaded guilty to the two misdemeanor charges stemming from these facts prior to trial. (Tr. 8-11).

7

## II. State Court Proceedings

Based on these events, a New York County grand jury returned an indictment that charged Watkins with two counts of second-degree burglary and two counts of second-degree attempted burglary. The indictment also charged him with two counts of fifth-degree criminal possession of stolen property based on evidence found in petitioner's possession at the time of arrest, though Watkins pleaded guilty to these two counts prior to trial. (Tr. 8-11).

## A. Pretrial Suppression Hearing

On January 8th and 14th, 2004, the Honorable Jeffrey Atlas, S.C.J., held a hearing on petitioner's motion to suppress the identification evidence that Officer Lynch had obtained from stopping petitioner on the street and all the evidence procured subsequent to petitioner's arrest. In support of the suppression motion, Watkins argued that Officer Lynch had performed an illegal stop and that evidence obtained after petitioner's later arrest was "fruit of the poisonous tree, [] that poisonous tree being the illegal arrest of Mr. Watkins." (Hr'g Tr. 132).

Four witnesses testified during the hearing: Officer Lynch, Detective Murphy, Detective Dros, and Detective Clancy. The

8

substance of their testimony corresponded to the sequence of events that we have just summarized. It bears mention that Detective Dros also testified to the investigation he made into the pawnshop ticket, having retrieved the jewelry associated with the ticket. (Hr'g Tr. 79, 113-14). Detective Clancy had linked the recovered jewelry to an earlier crime that he was investigating, the burglary of Lorraine West's residence at 28 West 90th Street on May 19, 2003. (Hr'g Tr. 80, 125, 128). Detective Clancy testified that he had shown the pawnshop clerk a photo array consisting of petitioner and five other similar-looking people, and the clerk identified petitioner as the person who had brought in the stolen jewelry. (Hr'g Tr. 125-30).[2]

Ultimately, the court denied the motion to suppress because the "sum total" of the circumstances facing Officer Lynch provided sufficient justification for the officer to stop petitioner and to require identification. (Hr'g Tr. 161-62). The sequence of burglaries in the neighborhood following the petitioner's stop and the evidence left behind at the crime scenes -- in particular the cell phone at 29 West 84th Street that contained petitioner's name and phone number -- led the court to the "inescapable" conclusion

---

[2] This evidence gave rise to the two misdemeanor counts of possession of stolen property (one count for the possession of Geest's identification, and the other for the possession of Ms. West's jewelry). (Tr. 8-11).

9

that petitioner's arrest was proper. (Hr'g Tr. 163-65).

## B. Trial and Sentencing

Petitioner proceeded to trial by jury before the Honorable Edward McLaughlin, S.C.J., on March 1, 2004. The prosecution presented the testimony of multiple witnesses. Iona Lutey of 33 West 84th Street, Gretchen Schumacher of 370 Columbus Avenue, Elizabeth Sweeney and Jennifer Frey of 29 West 84th Street, and Mary Rose and Kirk MacDonald of 114 West 78th Street each testified about the burglaries at their respective homes. (Tr. 272-304, 305-23, 422-41, 490-512). Detective James Murphy, Detective John Heintz, Police Officer Robert Lynch, and Detective Israel Dros testified to the events leading up to, and their contribution to, petitioner's arrest. (Tr. 324-31, 332-44, 450-489, 554-86). Gabriel Dominguez of T-Mobile USA provided testimony as to how the cell phone found at 29 West 84th Street was identified as petitioner's. (Tr. 345-52). Police Officer Kenneth Hernandez, who was first to arrive at the crime scene at 370 Columbus Avenue, and Police Officer Victor Rodriguez, who was a member of the Evidence Collection Team, which processed the crime scenes, also testified to their involvement in the police investigation. (Tr. 442-49, 513-53).

10

The State also called Dr. Melissa Potter, an expert in DNA analysis and forensic biology, as a fact and expert witness to establish that the forensic biology laboratory of the Office of the Medical Examiner had tested DNA samples from Watkins and matched them with samples found in one of the burgled apartments. (Tr. 353-83). According to Dr. Potter, the DNA tests performed on two blood samples from 114 West 78th Street and on a sample of petitioner's DNA indicated that the blood at the crime scene had come from petitioner. (Tr. 378-83, 414-15). She also testified that the laboratory created and maintained, as a business record, a file of the notes and test results, and after she identified that file, it was received into evidence without objection as a business record. (Tr. 366-68).

The defense presented no evidence. On March 4, 2004, the jury convicted Watkins on two counts of Burglary in the Second Degree and two counts of Attempted Burglary in the Second Degree.[3] (Tr. 675-78).

---

[3] For the burglaries of the residences of Elizabeth Sweeney, Jennifer Frey, and Beth Holman at 28 West 84th Street and of Kirk McDonald at 114 West 78th Street, petitioner was convicted of Burglary in the Second Degree. (Resp. 12, 17). For the incidents at the residences of Iona Lutey at 33 West 84th Street and of Gretchen Schumacher at 370 Columbus Avenue, petitioner was convicted of Attempted Burglary in the Second Degree. (Id. at 11, 15).

11

On March 30, 2004, the court conducted a sentencing hearing. (See Tr. of Sentencing Proceeding ("S.")). According to the predicate felony statement, petitioner had been convicted in the New York State Supreme Court of violent felonies twice before: on June 14, 1991, for Attempted Burglary in the Second Degree and on November 23, 1994, for Attempted Burglary in the First Degree. (S. 2-3). After the predicate felony statement was read into evidence, Watkins declared to the court: "I don't feel prior felonies from '91 and '94 should be used for enhancement purposes due to the fact that I never had a mandatory violent persistent hearing." (S. 7-8). The court rejected petitioner's contentions because his prior appeal of his 1991 felony conviction had led to an affirmance and because any opportunity to challenge the constitutionality of the prior convictions and sentences had long since passed. (S. 7-10). The court deemed petitioner a "mandatory persistent violent felony offender" and sentenced him to concurrent terms of twenty years to life for each of the two burglary convictions -- each a Class C felony -- and the two attempted burglary convictions -- each a Class D felony. (S. 14-15, 19-21).

## C. Direct Appeal

On appeal to the First Department, petitioner asserted four claims, all of which appear in his habeas petition. He claimed that

12

he had been denied his right to testify before the grand jury
(Pet'r's Appellate Br. 34); that the police had lacked reasonable
suspicion to stop him and subject him to a show-up (id. at 39);
that he had been denied his right to confront the witnesses against
him by the admission of testimony by an expert who had played no
role in the DNA-testing process about which she testified (id. at
46); and that his sentencing under New York's persistent-violent-
felony-offender statute violated Apprendi v. New Jersey, 530 U.S.
466 (2000). (Id. at 55). Petitioner also filed a pro se
supplemental brief, asserting one additional claim, which is also
found in his habeas petition -- that a sample of his DNA was taken
without probable cause. (Pro se Br. 13). In addition, the pro se
submission reiterated the argument that the investigatory stop and
show-up were not justified by the evidence then known to the
police. (Pro se Br. 22).

On May 8, 2007, the Appellate Division unanimously affirmed
petitioner's conviction and sentence and rejected all of his
claims. People v. Watkins, 40 A.D.3d 290, 837 N.Y.S.2d 7 (1st Dep't
2007). The court held that Watkins had not been deprived of his
right to testify before the grand jury and that "the prosecutor's
considerable and repeated efforts to contact defense counsel . . .
more than met the People's statutory obligation to provide
[petitioner] with a reasonable and meaningful opportunity to

13

testify before the grand jury." Id. at 290, 837 N.Y.S.2d at 7.
Regarding the asserted lack of reasonable suspicion to stop
petitioner, the panel held that the hearing court had properly
denied Watkins' motion to suppress. Id. at 291, 837 N.Y.S.2d at 8-
9. The court further noted that the stop had provided "no
suppressible fruits," as petitioner was not identified at the show-
up, and that although "the ultimate arrest yielded various fruits,
including physical evidence and a lineup identification, none of
these were fruits of the initial stop." Id. at 291, 837 N.Y.S.2d at
8-9. The court ruled that petitioner's Confrontation-Clause and
Apprendi claims were unpreserved and declined to review them in the
interest of justice. Id. at 292, 837 N.Y.S.2d at 9. It also stated
that even if the claims were to be reviewed, they would be rejected
on the merits. Id. at 292, 837 N.Y.S.2d at 9.

Petitioner next sought leave to appeal to the New York Court
of Appeals. (See Resp't's Decl. in Opp'n to Pet., Ex. D & E). The
leave letter requested that the Court review all the claims raised
in petitioner's appellate brief and supplemental pro se brief.
(Id.). On July 6, 2007, the Court of Appeals denied leave. (Id.,
Ex. G).

Following the Court of Appeal's denial, petitioner filed his
habeas petition in this court.

14

## ANALYSIS

In substance, petitioner reiterates the claims that he asserted on his direct appeal, which we will address seriatim after outlining the applicable standard of review.

## I. Standard of Review

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling either

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see, e.g., Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir.

15

2005); Bell v. Cone, 535 U.S. 685, 693-94 (2002); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (internal quotations omitted); Williams, 529 U.S. at 411. The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application"

16

provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "[s]ome increment of incorrectness beyond error is required . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)); accord Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

## II. Right to Testify Before the Grand Jury

Petitioner first asserts that he was deprived of his due-process right to testify before the grand jury after he had

17

demonstrated an intent to do so. (Pet. 6). The Appellate Division rejected this claim on the merits, holding that "[t]he record supports the motion court's conclusion that defense counsel's actions were not diligent in arranging for her client's grand jury appearance." Watkins, 40 A.D.3d at 290, 837 N.Y.S.2d at 8.

Petitioner's invocation of a right to testify before a grand jury fails because neither the Constitution nor any other source of federal law gives him such a right. Simply stated, the Grand Jury Clause of the Fifth Amendment applies only to federal prosecutions. See Alexander v. Louisiana, 405 U.S. 625, 633 (1972) ("Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury."). In addition, any defects in grand jury proceedings are mooted if the petit jury returns a conviction, since that verdict constitutes a determination that guilt was proven beyond a reasonable doubt. See United States v. Mechanik, 475 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning

18

a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court."). Therefore, petitioner's assertion that he was denied the right to testify before the grand jury does not invoke a federal claim cognizable on habeas review.

## III. Fourth-Amendment Claims

Petitioner articulates two Fourth-Amendment claims: first, that the police lacked reasonable suspicion to stop him on the street and to conduct a show-up, and second, that the trial court lacked probable cause to authorize the State to obtain a DNA sample from him.[4] The Appellate Division rejected both claims on the merits. It found that the police did have reasonable suspicion to stop petitioner since he was the only person in the sealed-off area in which the burglary had taken place; he was wearing a red garment while the perpetrator was seen sporting a red jacket; he attempted to walk away from the officer; and he was inappropriately dressed for the weather, which suggested an effort to conceal the identifying red garment. Watkins, 40 A.D.3d at 291, 837 N.Y.S.2d at

---

[4] Obtaining a DNA sample from petitioner constitutes a search under the Fourth Amendment. See Nicholas v. Goord, 430 F.3d 652, 680 (2d Cir. 2005) ("Without question, a blood test, and even a less intrusive cheek swab, for purposes of obtaining a DNA sample is a 'search.'" (quoting Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 616 (1989)).

8. The appellate panel further held that petitioner's motion to suppress was properly denied because the police stop did not produce any evidence that was introduced at trial. Id. at 291-92, 837 N.Y.S.2d at 8-9. The court noted that the evidence procured subsequent to petitioner's arrest did not stem from the police stop and that petitioner's arrest was supported by probable cause since he had left his cell phone at one of the crime scenes. Id. at 291-92, 837 N.Y.S.2d at 8-9. Regarding petitioner's pro se claim concerning the DNA sample, the court rejected the claim as "without merit." Id. at 291-92, 837 N.Y.S.2d at 8-9.

Since petitioner's Fourth-Amendment claims were fully and exhaustively adjudicated on the merits in state court, they do not qualify for federal habeas review. In Stone v. Powell, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth-Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 482 (1976). The Second Circuit has interpreted the "opportunity" for litigation provided by the State to mean "a statutory mechanism for suppression of evidence tainted by an unlawful search or seizure." Gates v. Henderson, 568 F.2d 830, 837 (2d Cir. 1977) (en banc); see, e.g., Capellan v. Riley,

20

975 F.2d 67, 70 (2d Cir. 1992). Absent a showing that "the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations" or that the petitioner was precluded from using the otherwise available procedure because of an "unconscionable breakdown" in the underlying process, petitioner cannot obtain habeas review. Capellan, 975 F.2d at 70.

Petitioner's claims that the police lacked reasonable suspicion to stop him and conduct a show-up and that the trial court lacked probable cause to compel a DNA sample fall squarely within the ambit of Fourth-Amendment claims precluded from federal habeas review. See Chavis v. Henderson, 638 F.2d 534 (2d Cir. 1980) (holding that Stone bars review of a claim that identification evidence from an arrest without probable cause should have been excluded, absent a showing that there was no full and fair opportunity to litigate the issue in state courts); Bell v. Ercole, 631 F. Supp. 2d 406, 415 (S.D.N.Y. July 1, 2009); Smith v. Conway, 2008 WL 780635, at *6 (S.D.N.Y. March 24, 2008) (finding that petitioner had full and fair opportunity to litigate claim that DNA sample was unlawfully obtained and establishing that claim was not cognizable on habeas review unless petitioner alleged an unconscionable breakdown in the underlying state procedure).

21

Petitioner does not allege that New York failed to provide an opportunity to litigate his Fourth-Amendment claims; indeed New York provides the requisite statutory mechanism through section 710 of the Criminal Procedure Law. See Gates, 568 F.2d at 837. Petitioner also does not and can not assert an "unconscionable breakdown" in the underlying state process, having successfully invoked and actively employed the statutory mechanisms available. He filed a motion to suppress the evidence uncovered as a result of the allegedly unlawful stop and show-up, participated in a hearing on that motion, received a detailed set of findings at the conclusion of the hearing, pursued the same claim on appeal, and was provided with a specific appellate ruling on the claim. He also challenged the trial court's decision to authorize the taking of a DNA sample from him in his appellate and supplemental pro se briefs to the Appellate Division. The pretrial suppression hearing and decision and the Appellate Division's review of all of petitioner's Fourth-Amendment claims constitute sufficient process for, and a full and fair opportunity to litigate, his Fourth-Amendment claims. Thus, these claims are not cognizable on federal habeas review.

IV. Confrontation-Clause Claim

Petitioner argues that his Sixth-Amendment right to confront witnesses against him was violated when the court admitted into

22

evidence documents reflecting DNA test results comparing DNA samples extracted from petitioner's saliva to that of the blood samples taken from the scene of the burglary at 114 West 78th Street. (Pet. 17). The DNA results were introduced and accepted into evidence at trial as business records through the testimony of Dr. Potter, a supervisor at the Office of Chief Medical Examiner, although she had not conducted the testing herself. (Tr. 353-54, 363, 366-67). Petitioner argues that the documented DNA results constituted testimonial evidence, and that the Confrontation Clause guaranteed him the right to cross examine the individuals who had personally performed the tests. (Pet. 17). The Appellate Division held that this claim was "unpreserved" and stated that even if the claim were to be reviewed, it would be found meritless. Watkins, 40 A.D.3d at 292, 837 N.Y.S.2d at 9. We conclude that petitioner's claim is procedurally barred from habeas review and that it is also without merit.

## A. Procedural Bar

If the highest state court to address a federal-law claim disposed of it on a "state law ground that is independent of the federal question and adequate to support the judgment," petitioner may not obtain habeas review unless he demonstrates both cause for his default and prejudice or else establishes that a failure to

23

address the claim would constitute a fundamental miscarriage of justice. See, e.g., Coleman v. Thompson, 501 U.S. 722, 729 (1991); Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) (quoting Harris v. Reed, 489 U.S. 255, 260 (1989)). If the appellate court rejects a claim as unpreserved and then, in the alternative, notes that it would have rejected the claim on its merits if it had considered them, the ruling is still considered to rest on procedural grounds. See, e.g., Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (state court's "contingent observation" is not an "adjudication on the merits" for purposes of habeas review); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

To be "adequate," the state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." Murden v. Artuz, 497 F.3d 178, 192 (2d Cir. 2007) (quoting Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)); see Lee v. Kemna, 534 U.S. 362, 376 (2002); Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003) (quoting Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999)). In assessing adequacy, the Second Circuit has suggested three general considerations as pertinent to the analysis. These are:

> (1) whether the alleged procedural violation was actually relied on in the trial court [or the appellate court], and whether perfect compliance with the state rule would have

24

changed the . . . court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Murden, 497 F.3d at 192 (quoting Cotto, 331 F.3d at 240). The federal court, in making this determination, owes deference to the state courts, and should find a state procedural-default ruling adequate as long as it has "a fair or substantial basis in state law." Garcia, 188 F.3d at 78 (citing, inter alia, Arce v. Smith, 889 F.2d 1271, 1273 (2d Cir. 1989)). It bears emphasis that "[b]ecause of comity concerns, a decision that a state procedural rule is inadequate should not be made 'lightly or without clear support in state law.'" Murden, 497 F.3d at 192 (quoting Garcia, 188 F.3d at 77).

As for the requirement of independence, the holding must rest on state law that is not "interwoven with the federal law." Jimenez, 458 F.3d at 137 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). Since it can be "'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference,' . . . reliance on state law must be 'clear from the face of the opinion.'" Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000) (quoting Coleman, 501 U.S. at 732, 735). When determining whether we may entertain a claim, we

25

"apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001)(quoting Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000)).

A petitioner may obtain habeas review of his otherwise procedurally-barred claims only if he demonstrates cause for the default and actual prejudice, or else shows that failure by the habeas court to consider the claims would result in a fundamental miscarriage of justice. See, e.g., Coleman, 501 U.S. at 749-50; Jimenez, 458 F.3d at 138. "'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Strickler v. Greene, 527 U.S. 263, 283 n.24 (1999) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). Cause may be demonstrated by "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'interference by officials' . . . made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel."[5] Carrier, 477 U.S. at 488; see, e.g., Restrepo v. Kelly,

---

[5] It bears mention that, as a procedural matter, a petitioner cannot invoke a Sixth Amendment ineffective-assistance claim as cause unless he has asserted such an argument as an independent

26

178 F.3d 634, 640 (2d Cir. 1999); Bossett v. Walker, 41 F.3d 825,

829 (2d Cir. 1994). To demonstrate prejudice, the petitioner must

show "not merely that the errors at his trial created a *possibility*

of prejudice, but that they worked to his *actual* and substantial

disadvantage, infecting his entire trial with error of

constitutional dimensions." United States v. Frady, 456 U.S. 152,

170 (1982) (emphasis in original); see, e.g., Rodriquez v.

Mitchell, 252 F.3d 191, 203-04 (2d Cir. 2001); Holland v. Scully,

797 F.2d 57, 69 (2d Cir. 1986).

        The only other exception to the procedural-bar rule applies if

the petitioner demonstrates that the habeas court's refusal to

consider the merits of his procedurally barred claim would result

in a "fundamental miscarriage of justice." Coleman, 501 U.S. at

750. This "rare" exception is reserved for the "extraordinary

case[] where a constitutional violation has probably resulted in

the conviction of one who is actually innocent." Schlup v. Delo,

513 U.S. 298, 321 (1995) (quoting Carrier, 477 U.S. at 496); see

also Doe v. Menefee, 391 F.3d 147, 160-61 (2d Cir. 2004). Moreover,

the petitioner is expected to establish actual innocence based on

new evidence rather than what was presented at trial. See, e.g.,

Schlup, 513 U.S. at 327, 329.

---

claim in state court and exhausted his state-court remedies as to
that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451-53
(2000).

As already noted, the Appellate Division explicitly concluded that petitioner's Confrontation-Clause claim was unpreserved. This ruling invokes an independent and adequate state-law ground based on New York's contemporaneous-objection rule, which states that

> For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.

N.Y. Crim. Proc. L. § 470.05(2). The contemporaneous-objection rule is purely a matter of state law. See, e.g., Reese v. Greiner, 2003 WL 21459577, *5 (S.D.N.Y. June 23, 2003). As such, the requirement of independence is satisfied.

The Appellate Division's ruling also satisfies the requirement of adequacy, as "New York's contemporaneous objection rule is firmly established and regularly followed by state courts, as the Second Circuit has long recognized." Simpson v. Portuondo, 2002 WL 31045862, at *4 (S.D.N.Y. June 4, 2002) (referencing Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990)); see Garcia, 188 F.3d at 79-82 (finding that New York has a well-established preservation rule). More specifically, New York's preservation rule has been consistently applied to Confrontation-Clause claims. See, e.g., People v. Traut, 24 A.D.3d 692, 693, 808 N.Y.S.2d 379, 379 (2d

28

Dep't 2005) ("The defendant failed to preserve for appellate review his argument that certain DNA evidence was admitted in violation of his Sixth Amendment right to confront witnesses against him."); People v. Morel, 8 Misc.3d 67, 71, 798 N.Y.S.2d 315, 318 (2d Dep't 2005) (slip) (finding defendant's Confrontation-Clause claim unpreserved because it "must be articulated with the requisite reference to the Federal Constitutional right" and the objection was raised "solely on state-law hearsay grounds"). Moreover, the application of the preservation rule in this instance meets the three factors laid out in Cotto: petitioner never raised an objection to Dr. Potter's testimony, so there is no question of whether the procedural violation was relied upon at trial and it was certainly relied upon on appeal; petitioner was required to assert his objection contemporaneously under the preservation rule to avoid surrendering his claim for appeal; and petitioner did not "substantially comply" with the rule, but rather ignored it entirely, thus denying the trial court the opportunity to rectify the potential error as it took place.

Petitioner fails to overcome the procedural bar to his claim, as he has established neither cause for the default and resulting prejudice nor a fundamental miscarriage of justice. He cannot demonstrate cause as he does not cite an "objective factor" that prevented his counsel from objecting to the DNA testimony at trial

and does not argue that this failing amounted to ineffective assistance of counsel. Moreover, even if he were to claim that counsel's failure to object constituted ineffective assistance, the argument would be barred because it was not raised in state court. Petitioner also fails to demonstrate that enforcing the state rule here would amount to a fundamental miscarriage of justice. The evidence at trial amply demonstrated his guilt, and he offers no new evidence to demonstrate innocence. In short, petitioner's claim is procedurally barred because the Appellate Division's ruling rested on an independent and adequate state-law ground.

## B. Merits of Confrontation-Clause Claim

Even if we ignored the procedural bar to petitioner's claim, the results would not change. His assertion that the admission of the DNA test results into evidence constituted a violation of his right to confronation is baseless. (See Pet. 17-20).

In Crawford v. Washington, the Supreme Court held that the Sixth Amendment's Confrontation Clause bars the admission of certain out-of-court statements that the court deems "testimonial" unless the declarant appears at trial or, if the witness is unavailable, the defendant has had a prior opportunity to cross-examine the declarant regarding the statement. 541 U.S. 36, 53

30

(2004); <u>Melendez-Diaz v. Massachusetts</u>, 129 S.Ct. 2527, 2531 (summarizing holding in <u>Crawford</u>); <u>United States v. Feliz</u>, 467 F.3d 227, 231 (2d Cir. 2006) (same); <u>see</u>, <u>e.g.</u>, <u>United States v. Burden</u>, 600 F.3d 204, 223-25 (2d Cir. 2010). The <u>Crawford</u> Court acknowledged that there exist various formulations of what constitutes a "testimonial" statement:

> [E]x parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

<u>Id.</u> at 51-52. However, the court declined "to spell out a comprehensive definition of 'testimonial'" and stated that, at a minimum, the term applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." <u>Id.</u> at 68. The court also noted that certain statements "by their nature [are] not testimonial," citing business records as an example of one such class of statements. <u>Id.</u> at 55.

Subsequent to <u>Crawford</u>, lower courts -- including the Second Circuit -- have grappled with the application of the term "testimonial" to a variety of evidence. <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

Mejia, 545 F.3d 179, 198-99 (2d Cir. 2008) (finding a violation of Crawford because a police officer expert introduced out-of-court testimonial statements made by individuals during custodial interrogations and presented them "in the guise of an expert opinion"); United States v. Williams, 506 F.3d 151, 154-56 (2d Cir. 2007) (finding that defendant's self-inculpatory statements implicating a second defendant were non-testimonial); United States v. McClain, 377 F.3d 219, 221 (2d Cir. 2004) (holding that a plea allocution is a testimonial statement).

In the wake of Crawford, the Second Circuit initially interpreted the term "testimonial" fairly broadly, based on the Supreme Court's reference to "statements [that] an objective witness reasonably [could] believe . . . would be available for use at a later trial." 541 U.S. at 52. Thus, the Court interpreted that language to encompass statements made for use or likely to be used in a forthcoming prosecution. See, e.g., United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004) (citing Crawford, 541 U.S. at 52)).

Subsequently, however, the Second Circuit has seized upon the Crawford reference to business records as non-testimonial, holding that "where a statement is properly determined to be a business record as defined by [Rule 803(6) of the Federal Rules of

32

Evidence], it is not testimonial within the meaning of Crawford,

even where the declarant is aware that it may be available for

later use at a trial." Feliz, 467 F.3d at 236; see also id. at 234-

35 (discussing Saget dictum). The Circuit Court in Feliz reasoned

that autopsy reports prepared by New York's Office of the Chief

Medical Examiner constituted non-testimonial business records in

part because such records were "routine" and "kept in the course of

a     regularly     conducted     business     activity."[6]

_____

[6] The Circuit Court did not base its holding directly upon
the fact that Crawford had referenced business records as an
example of non-testimonial evidence, a reference that could be
construed as dictum. Feliz, 467 F.3d at 234 & n.4 (noting that
Justice Rehnquist's concurrence treats business records as an
exception to the Confrontation Clause simply by virtue of their
status as business records). Rather, the Court moved past the
"superficial     appeal"   of   such   reasoning   to   consider   the
characteristics of a business record that render it "fundamentally
inconsistent with what the Supreme Court has suggested comprise the
defining characteristics of testimonial evidence." Id. at 234. The
Circuit Court thus reinforced the precedential power of the
Crawford   Court's   designation   of   business   records   as   non-
testimonial.

We note that Crawford, as it was applied in Feliz, does not
necessarily foreclose petitioner's argument that the DNA test
results constituted testimonial evidence. The Feliz court observed
that, under the rules of evidence, records prepared in anticipation
of litigation fall outside the definition of "business records" and
the concomitant classification as non-testimonial evidence. Id. at
234. The Court emphasized the fact that autopsy reports were
generated by the Medical Examiner regardless of the existence of
any legal proceedings. See id. at 236-37 (citing, inter alia,
Durio, 7 Misc.3d at 736, 794 N.Y.S.2d at 869 ("That [an autopsy
report] may be presented as evidence in a homicide trial does not
mean that it was composed for that accusatory purpose or that its
use   by   a   prosecutor   is   the   inevitable   consequence   of   its
composition."); People v. Washington, 86 N.Y.2d 189, 193, 630
N.Y.S.2d 693(1995) (noting that the mandate of the Medical
Examiner's Office is "to provide an impartial determination of the
cause of death.")); accord Melendez-Diaz, 129 S.Ct. at 2531

Id. at 236 (quoting Durio, 7 Misc.3d at 736, 794 N.Y.S.2d at 869
(N.Y.Sup.Ct. 2005)).

Most recently, in Melendez-Diaz v. Massachusetts, the Supreme
Court reaffirmed its general analysis from Crawford and finally
clarified that "[b]usiness and public records are generally
admissible absent confrontation not because they qualify under an
exception to the hearsay rules, but because -- having been created
for the administration of an entity's affairs and not for the
purpose of establishing or proving some fact at trial -- they are
not testimonial." 129 S.Ct. at 2539-40.

_____

(explaining that "Business and Public records are generally
admissible absent confrontation . . . because -- having been
created for the administration of an entity's affairs and not for
the purpose of establishing or proving a fact at trial -- they are
not testimonial."). In arguable contrast, DNA tests designed to
calculate the probability that DNA recovered from a crime scene
belongs to a particular defendant appear to be more specifically
keyed to preparations for trial, particularly where, as here, such
tests are ordered by the trial court. See Davis v. Washington, 547
U.S. 813 (2006) (articulating a "primary purpose" test for
determining whether a statement is testimonial in nature); see also
United States v. Boyd, 686 F. Supp. 2d 382 (S.D.N.Y. March 1,
2010)(finding that DNA evidence falls within the Confrontation
Clause). Nevertheless, this potential distinction does not undercut
the reasonableness of the state courts' findings about the
admissibility of the DNA documents. See People v. Meekins, 828
N.Y.S.2d 83, 85, 34 A.D.3d 843, 845 (2d Dep't 2006) (Slip Op.
No.09018)(finding that DNA report created from rape kit did not
violate defendant's right to confrontation).

34

Petitioner argues in substance that the laboratory file containing the DNA test results constituted testimonial evidence and that its admission absent the testimony of the analyst who performed the tests violated his right to confrontation. (Pet. 17). Respondent contends that this claim is without merit because the DNA file constitutes a business record, which is non-testimonial and not subject to the Confrontation Clause under Crawford. (Resp. 36). We first identify the standard of review and the relevant Supreme Court precedent for the purpose of evaluating petitioner's claim and then address his claim.

As previously noted, a federal habeas court may only grant relief when the state court's adjudication on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For purposes of our analysis of the merits of Watkins' confrontation claim, we treat section 2254(d)(1) as applicable to limit the scope of our review even though the Appellate Division initially found the claim unpreserved, since that panel did go on to state in the alternative that, had it decided the appeal on the merits, it would have found the claim meritless.[7] See, e.g., Zarvela v. Artuz, 364 F.3d 415,

---

[7] As we have noted, this alternative merits holding does not affect our procedural-bar analysis because the state court is deemed in such circumstances to have relied on the procedural

35

417 (2d Cir. 2004); Sharpe v. Bell, 593 F.3d 372, 382-83 (4th Cir. 2010) (finding that the state court's alternate, merit-based ruling is entitled to AEDPA deference); Brooks v. Bagley, 513 F.3d 618, 624-25 (6th Cir. 2008)(citing cases). Accordingly, the confrontation claim would have to be rejected unless the Appellate Division decision was contrary to, or unreasonably applied, the pertinent Supreme Court precedent.

Moreover, the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412-13 (O'Connor, J.) (emphasis added). Therefore, our review of the relevant state-court decision, which is the Appellate Division's ruling on May 8, 2007, does not encompass the Supreme Court's decision in Melendez-Diaz, issued on June 25, 2009. The merits of petitioner's claim must instead be assessed under the principles of Crawford, which was issued in 2004.

_____

default. See p. 24, supra. Nonetheless, when we too offer a merits analysis as an alternative basis to reject the petition, it is appropriate for us -- as a hypothetical matter -- to assume that if the Appellate Division had not relied on the procedural ground (a hypothetical necessary for us to reach the merits), it would have rejected Watkins' confrontation claim on the merits.

As noted above, as of 2007, there was no well-settled Supreme Court precedent that would have dictated that the laboratory case file was testimonial and hence subject to Confrontation-Clause exclusion.[8] We must, therefore, allow the state court's reasonable application of ambiguous Supreme Court precedent to stand in the face of petitioner's challenge. Moreover, even subsequent Supreme Court precedents -- specifically the decision in Melendez-Diaz -- suggested that business records are generally excepted from Confrontation-Clause challenge. Melendez-Diaz, 129 S.Ct. at 2539-40.

In any event, even if we were to treat the DNA reports at issue as testimonial evidence, Watkins' claim would still fail. The admission of testimonial evidence only violates a defendant's right to confrontation when the evidence is not subject to cross-examination. Crawford, 541 U.S. at 53. Dr. Potter served as a witness open to cross-examination and was, in fact, cross-examined by defense counsel on the reliability of the laboratory techniques

---

[8] Some courts have gone so far as to suggest that the particular question at issue here -- that is, whether an expert witness whose analysis of DNA test results is made in reliance upon results of tests performed by other members of the lab infringes on the defendent's right to confrontation -- still remains open, even in the wake of Melendez-Diaz. See, e.g., United States v. Rose, 587 F.3d 695 (5th Cir. 2009); Pendergrass v. State, 913 N.E.2d 703 (Ind. 2009); United States v. Darden, 656 F.Supp.2d 560 (D.Md. 2009); Rector v. State, 285 Ga. 714, 681 S.E.2d 157 (2009).

and analysis employed in testing defendant's DNA. As the Court noted in Melendez-Diaz, not "everyone who laid hands on the evidence must be called," 129 S.Ct. at 2532 n.1. Indeed, in the wake of that decision, some courts have held that the testimony of a lab supervisor rather than the actual analyst would satisfy the demands of the Confrontation Clause. See, e.g., Pendergrass, 913 N.E.2d at 707-08 (rejecting defendant's Confrontation-Clause claim because "[the prosecution] chose to call the laboratory supervisor rather than the laboratory processor" and "[t]he laboratory supervisor who took the stand did have a direct part in the process by personally checking [the processor]'s test results").[9] In short, the admission of the DNA documentation cannot be said to have unreasonably applied settled Supreme Court precedent.

Finally, even if the trial court had erred in admitting the DNA records based on Dr. Potter's testimony, the error would have been harmless. In a habeas proceeding, the court assesses a federal constitutional error in state criminal proceedings under the "substantial and injurious effect" standard. Fry v. Pliler, 551 U.S. 112, 121 (2007) (quoting Brecht v. Abramson, 507 U.S. 619, 622 (1993)). The exclusion of the DNA evidence in question would not

---

[9] It also bears emphasis that petitioner has not challenged Dr. Potter's testimony as an expert as a Confrontation-Clause violation, and in the habeas context that testimony could not be successfully challenged given the current state of Supreme Court jurisprudence. See generally Boyd, 686 F. Supp. 2d at 383-85 (noting unsettled state of the law in such circumstances).

38

have undercut the reliability of the jury's verdict. The DNA evidence was recovered from, and only related to, the burglary at 114 West 78th Street, which is one of the four relevant crime scenes. Aside from the DNA results, the State offered overwhelming evidence to prove that petitioner had burglarized that location as well as the other three apartments. Officer Lynch stopped petitioner on the street near 114 West 78th Street not long after the burglary at that location had taken place, and he noted that petitioner was wearing a woman's brown hat, a black raincoat, and a red apron -- items that he subsequently learned matched the exact description of what had been stolen from that crime scene. While the DNA evidence undeniably proved petitioner's presence at 114 West 78th Street, the exclusion of that evidence would almost certainly not have altered the jury's verdict on that count of burglary and could not have undermined petitioner's three other burglary convictions.

## V. The Apprendi Claim

In his final claim, petitioner contends that his sentencing as a persistent violent offender under New York Penal Law § 70.08 was a question of fact that should have been submitted to a jury, as required by Apprendi v. New Jersey, 530 U.S. 466 (2000). However, petitioner failed to assert this challenge to his sentence at trial, and, as with his Confrontation-Clause claim, the Appellate

39

Division rejected his sentencing claim as "unpreserved" and in any event meritless. Watkins, 40 A.D.3d at 292, 837 N.Y.S.2d at 9. For the reasons set forth below, we find that petitioner's claim is procedurally barred from federal habeas review and is without merit.

A. Procedural Bar

The Appellate Division's ruling invoked New York's contemporaneous-objection rule, which constitutes an independent and adequate state law ground. New York's preservation rule is firmly established and well-recognized and is based purely on state law. See Garcia, 188 F.3d at 79-82. Also, the application of the preservation rule to petitioner's Apprendi claim satisfies the three factors laid out in Cotto for assessing the adequacy of the ground invoked by the state court. First, petitioner did not pursue an Apprendi challenge to his sentencing as a persistent violent offender in the trial court. Second, petitioner was required to raise an objection to his sentencing contemporaneously under the preservation rule to avoid surrendering his claim on appeal, since New York courts have consistently applied the rule in circumstances such as petitioner's. See, e.g., People v. Besser, 96 N.Y.2d 136, 148, 726 N.Y.S.2d 48, 54 (1st Dep't 2001) ("Further, as [defendant] failed to raise his challenge to the constitutionality of the

40

discretionary persistent felony offender sentencing statute before the sentencing court, the issue is not properly before us for review"); People v. Dietz, 66 A.D.3d 1400, 1400, 885 N.Y.S.2d 811, 812 (4th Dep't 2009) (defendant's claim that court failed to impose reduced sentence in violation of plea agreement was unpreserved because defendant did not object during sentencing); People v. Anderson, 57 A.D.3d 794, 794, 868 N.Y.S.2d 552, 552 (2d Dep't 2008) (defendant's failure to raise claim during sentencing that duration of order of protection exceeded statutory maximum left objection unpreserved); People v. Baez, 52 A.D.3d 840, 840, 859 N.Y.S.2d 375, 376 (2d Dep't 2008) (defendant's claim that sentencing court improperly considered certain information when imposing sentence was unpreserved because defendant failed to object during sentencing); People v. Brink, 30 A.D.3d 1014, 1015, 815 N.Y.S.2d 861, 862 (4th Dep't 2006) (defendant's failure to object to sentencing in the absence of a complete record of his mental-health history meant objection was unpreserved). Third, petitioner's failure to alert the trial court to the issue prevented that court from addressing the argument that he later pressed in the Appellate Division.

Petitioner fails to overcome the procedural bar to habeas review for his Apprendi claim because he asserts neither cause for the default and resulting prejudice nor a fundamental miscarriage

of justice. He does not advance an explanation for counsel's failure to comply with New York's preservation rule or even suggest that counsel's failure to present the claim constitutes ineffective assistance.[10] He likewise fails to establish a fundamental miscarriage of justice, since the trial evidence is fully consistent with guilt and Watkins proffers no further evidence to vouch for his innocence. Therefore, petitioner's claim is procedurally barred.

B. Merits of Apprendi Claim

If petitioner's claim were not procedurally barred, it would still fail because it lacks merit.

Petitioner was convicted on two counts of Burglary in the Second Degree (N.Y. Penal Law § 140.25(2)) and two counts of Attempted Burglary in the Second Degree (N.Y. Penal Law §§ 110, 140.25(2)). Absent any predicate felonies, a defendant convicted of Burglary in the Second Degree -- a violent Class C felony -- would receive a minimum sentence of at least three and one-half years and a maximum of fifteen years. N.Y. Penal Law § 70.02(1)(c), (3)(b)

---

[10] In any event, petitioner could not invoke a Sixth Amendment theory of cause since he did not pursue such a claim in state court.

(McKinney 2009). Attempted Burglary in the Second Degree is a violent Class D felony and carries a minimum sentence of at least two years and a maximum of seven years in the absence of predicate felonies. N.Y. Penal Law § 70.02(1)(d), (3)(c) (McKinney 2009). However, under New York Penal Law § 70.08(1), a defendant may be deemed a persistent violent felony offender, if he "stands convicted of a violent felony offense . . . after having previously been subjected to two or more predicate violent felony convictions." If the defendant is found to be a persistent violent felony offender, "the court must impose an indeterminate sentence of imprisonment . . . the maximum term of which shall be life imprisonment" and the minimum term of which is dependent on the type of felony committed. N.Y. Penal Law § 70.08(2)-(3). For Class C felonies, the elevated minimum sentence is sixteen years, and for Class D felonies, the enhanced minimum sentence is twelve years. N.Y. Penal Law § 70.08 (3)(b)-(c).

Since petitioner was previously convicted of two violent felonies -- Attempted Burglary in the Second Degree on June 14, 1991 and Attempted Burglary in the First Degree on November 23, 1994 -- the court correctly deemed petitioner a persistent violent offender under section 70.08. (S. 2-3)[11]. Petitioner was sentenced

---

[11] Section 70.08(1) of the New York Penal Law defines a persistent felony offender in relevant part as:
    (a) A persistent violent felony offender is a person

43

for his two burglary convictions and two attempted burglary
convictions to concurrent terms of twenty years to life, which

_____

who stands convicted of a violent felony offense as
defined in subdivision one of section 70.02 . . . after
having previously been subjected to two or more
predicate violent felony convictions . . . .

"Violent felony offenses" are defined in section 70.02 by
reference to specific sections of the New York Penal Law. Paragraph
(b) of subdivision one of § 70.04 lists the criteria used to
determine whether a prior conviction is a predicate violent felony
conviction. The provisions states in relevant part that

(i) The conviction must have been in this state of a
class A felony (other than one defined in article two
hundred twenty) or of a violent felony offense as
defined in subdivision one of section 70.02, or of an
offense defined by the penal law in effect prior to
September first, nineteen hundred sixty-seven, which
includes all of the essential elements of any such
felony, or in any other jurisdiction of an offense
which includes all of the essential elements of any
such felony for which a sentence to a term of
imprisonment in excess of one year or a sentence of
death was authorized and is authorized in this state
irrespective of whether such sentence was imposed;

(ii) Sentence upon such prior conviction must have been
imposed before commission of the present felony;

. . .

(iv) Except as provided in subparagraph (v) of this
paragraph, sentence must have been imposed not more
than ten years before commission of the felony of which
the defendant presently stands convicted;

(v) In calculating the ten year period under
subparagraph (iv), any period of time during which the
person was incarcerated for any reason between the time
of commission of the previous felony and the time of
commission of the present felony shall be excluded and
such ten year period shall be extended by a period or
periods equal to the time served under such
incarceration[.]

44

falls squarely within the permissible ranges of sixteen years to life for burglary and of twelve years to life for attempted burglary.

Petitioner contends in substance that his status as a persistent violent felony offender rests on factual findings concerning his past convictions, and that these findings should have been made by a jury under a reasonable-doubt standard. (Pet. 21). While noting the exception in Apprendi for "the fact of a prior conviction" in sentencing enhancement schemes, he asserts that this exclusion stands on shaky ground in view of subsequent Supreme Court precedent. (Pet'r's Appellate Br. 56). He also argues that his adjudication as a persistent violent felony offender rests on "ancillary facts," beyond the mere fact of a prior conviction, which need to be proved beyond a reasonable doubt. (Pet'r's Appellate Br. 59-60).

According to Apprendi, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The exception for "the fact of a prior conviction" is an affirmation of the prior ruling in Almendarez-Torres v. United States, 523 U.S. 224 (1998), in which the Supreme Court held that a defendant's recidivism as a

45

ground for an increased sentence need not be included in the indictment and determined in a jury trial. Apprendi, 530 U.S. at 489-90.

Petitioner's increased sentence based on his qualification as a persistent violent offender under section 70.08 does not run afoul of the Supreme Court's jurisprudence or violate his constitutional rights under the Sixth and Fourteenth Amendments. The details of petitioner's past convictions necessary to qualify him as a persistent violent offender, such as time and place of prior convictions and corresponding duration and location of incarceration, were presented in a predicate felony statement to defense counsel during sentencing proceedings. (S. 2-4). Petitioner did not dispute the fact of his past convictions. (S. 4-9).[12] The judge justifiably deemed petitioner's predicate felony statement as admitted and used it as a basis for sentencing consistent with the

---

[12] Petitioner took issue with the dates of his incarceration, and his counsel argued that sentencing minutes from his past convictions were unavailable. (S. 4-12). However, petitioner failed to contest the validity of mandatory sentencing based on his prior convictions, as the court received from the State Department of Correctional Services his incarceration record, which was corroborated by other documentation, and it used this record to satisfy the timing requirements of section 70.04 to find petitioner a persistent violent felony offender. (S. 8-12). Moreover, the court stated that the missing sentencing minutes are of no consequence because "[v]irtually nothing happens at a sentence that is of significance here" and that "[a]ny opportunity to challenge the constitutionality of those two sentences and pleas, convictions are past." (S. 12).

46

principles of Apprendi. (S. 11-12). Given petitioner's undisputed past convictions, the sentencing was valid and not in violation of Apprendi. See Shepard v. United States, 544 U.S. 13, 25 (2005) (identifying the concern underlying Apprendi as being that "the Sixth and Fourteenth Amendments guarantee . . . a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence") (emphasis added).

The claim also fails because, under current Supreme Court caselaw, criminal-history facts are not subject to a jury trial. Dretke v. Haley, 541 U.S. 386, 395 (2004). While the Supreme Court held in In re Winship, 397 U.S. 358 (1970), that due process requires proof of each element of a criminal offense beyond a reasonable doubt, the Court has "not extended Winship's protections to proof of prior convictions used to support recidivist enhancements." Dretke, 541 U.S. at 395 (citing Almendarez-Torres, 523 U.S. 224). Here, the facts relevant to petitioner's increased sentencing fall within the exception stated in Apprendi that a judge may still make a finding of fact (applying a preponderance-of-the-evidence standard) as to "the fact of [a defendant's] prior conviction[s]." Apprendi, 530 U.S. at 490; see also United States v. Santiago, 268 F.3d 151, 156 (2d Cir. 2001) ("In short, we read Apprendi as leaving to the judge, consistent with due process, the task of finding not only the mere fact of previous convictions but

47

other related issues as well.").

Petitioner argues that Almendarez-Torres would no longer be followed today and that therefore "any alleged fact -- including the fact of a prior conviction -- must be submitted to a jury for its determination, unless the right is affirmatively waived by the defendant." (Pet'r's Appellate Br. 57). For this proposition, petitioner cites the fact that Justice Thomas, who was in the 5-4 majority in Almendarez-Torres, has since opined that the decision was incorrect, Apprendi, 530 U.S. at 520-21 (Thomas J., concurring), and he further notes that some lower courts have recognized the shaky ground on which the decision stands. See, e.g., People v. Rivera, 5 N.Y.3d 61, 800 N.Y.S.2d 51 (2005) ("a majority of the present Justices of the Supreme Court have expressed disagreement with Almendarez-Torres"). (Pet'r's Appellate Br. 57).

Be that as it may, we are bound to apply the Almendarez-Torres exception to the Apprendi rule in this case for several reasons. First, an extension of Apprendi to encompass petitioner's prior convictions would not help his case since he did not dispute the violent-felony convictions that formed the basis for his sentencing under section 70.08.

48

Second, we are bound by Almendarez-Torres and Apprendi, because the Supreme Court has not overruled its earlier decisions on this point. See United States v. Estrada, 428 F.3d 387, 390 (2d Cir. 2005) (affirming that Almendarez-Torres is still good law); Rivera, 5 N.Y.3d at 67, 800 N.Y.S.2d at 55 (recognizing the Supreme Court's "obvious prerogative to overrule its own decisions" and therefore "follow[ing] Almendarez-Torres until the Supreme Court rules otherwise"). It also bears mention that as recently as 2006, the Supreme Court had occasion to revisit the Almendarez-Torres exception, yet did not do so. See Rangel-Reyes v. United States, 547 U.S. 1200 (2006) (denying cert.).

Finally, 28 U.S.C. § 2254(d)(1), which defines the standard for habeas review, prevents us from granting relief unless the state court's adjudication of the question was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." We cannot grant relief for petitioner's Apprendi claim, as it would run counter to binding Supreme Court precedent and require us to anticipate a possible future change in Supreme Court jurisprudence.

Petitioner also claims that his sentencing as a persistent violent felony offender rests on more than the mere fact of his

49

past convictions, as the definition of "predicate violent felony conviction" under New York Penal Law § 70.08 incorporates ancillary facts, such as whether the past convictions fall within the ten-year time limitation. He contends that these ancillary facts ought to be proved beyond a reasonable doubt. We disagree. The Second Circuit has noted that "[t]he determination of 'the fact of a prior conviction' implicitly entails many subsidiary findings . . . ." Santiago, 268 F.3d 151, 156 (2d Cir. 2001). The court may examine, without a jury, petitioner's record of incarceration and make any requisite calculations. See, e.g., O'Garro v. Ercole, 2007 WL 401194, at *4 (S.D.N.Y February 5, 2007) (holding that "New York Penal Law Section 70.08's requirement that a defendant have two predicate felony convictions falls within Apprendi's 'fact of a prior conviction' exception and that the sentencing court's determination of the length of the petitioner's prior incarceration for purposes of determining whether he was a persistent violent felony offender was not contrary to nor an unreasonable application of Supreme Court precedent").

## CONCLUSION

For the foregoing reasons, we recommend that the writ be denied and the petition dismissed with prejudice. We further recommend denial of a certificate of appealability, since the

50

petition raises no issue that warrants appellate review.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard J. Holwell, Room 1950, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: New York, New York
        July 22, 2010

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been
mailed today to:

Mr. Carl Watkins
#04-A-2057
Clinton Correctional Facility
Box 2001
Dannemore, New York 12929

Priscilla Steward, Esq.
Assistant Attorneys General
   For the State of New York
120 Broadway
New York, New York 10271